I6RHBerS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            16 Cr. 0746(PKC)

5   DAVID BERGSTEIN,
                                             Sentence
6              Defendant.
    ------------------------------x
7                                            June 27, 2018
                                             2:16 p.m.
8   Before:

9                    HON. P. KEVIN CASTEL,

10                                           District Judge

11                        APPEARANCES

12  GEOFFREY S. BERMAN
         United States Attorney for the
13       Southern District of New York
    BY:  EDWARD IMPERATORE
14       ROBERT ALLEN
         ELISHA KOBRE
15            Assistant United States Attorneys

16  FREEMAN NOOTER & GINSBERG
         Attorneys for Defendant
17  BY:  LEE GINSBERG

18  BIENERT, MILLER & KATZMAN, PLC
         Attorneys for Defendant
19  BY:  THOMAS H. BIENERT, JR.
         ANTHONY R. BISCONTI
20
    ALSO PRESENT:  JAMES KIM, Special Agent IRS
21                 JOSEPH STRAWMAN, Special Agent FBI

22

23

24

25
```

1          (Case called)

2          MR. IMPERATORE:  Good afternoon.  Edward Imperatore,

3  Robert Allen and Elisha Kobre, for the government.  With us at

4  counsel table is Special Agent Joseph Strawman of the FBI and

5  Special Agent James Kim of the IRS.

6          THE COURT:  Good afternoon to you.

7          And for the defendant.

8          MR. GINSBERG:  Good afternoon.  Lee Ginsberg, Thomas

9  Bienert, and Tony Bisconti, for Mr. Bergstein, who's seated to

10  my right.

11          THE COURT:  All right.  Good afternoon to all of you.

12          Let me begin, Mr. Ginsberg, with going through the

13  materials I have, and the question will be whether I have

14  everything I should have.

15          I have a presentence report, recommendation, and

16  addendum revised by probation on June 7, 2018.  I have a

17  sentence memorandum submitted on behalf of Mr. Bergstein dated

18  June 13, 2018, which has associated with it three volumes of

19  exhibits ranging up to Exhibit 33.  I have the materials that

20  were submitted by each side in connection with the *Fatico*

21  hearing, including exhibits.  And I have the government's

22  sentencing memorandum which annexes certain victim information.

23  And the government's memorandum, I don't see a date on it, but

24  it's 41 pages in length, and has next to it Exhibits A through

25  E.

1          Do I have everything I should have on the subject of

2     sentencing?

3          MR. GINSBERG:  You do, your Honor.  The only other

4     thing I would mention is that we did submit a letter, I

5     believe, Friday of last week in response to something that was

6     raised in the government's submission, and we had a link to a

7     recorded telephone conversation.

8          THE COURT:  Yes.  I'm aware of that, and I received

9     that as well.  But thank you for noting that.

10          MR. GINSBERG:  You're welcome.

11          THE COURT:  All right.  Does the government agree that

12     I have everything I should have on the subject of sentence?

13          MR. IMPERATORE:  Yes, your Honor, with the exception

14     of the letters that we've submitted on forfeiture and

15     restitution, which we understand will be addressed at a later

16     date.

17          THE COURT:  Yes.  And they are part of the submissions

18     that I took with the *Fatico* hearing.  So thank you for pointing

19     that out.

20          Mr. Ginsberg, has the defendant read, reviewed, and

21     discussed with you the presentence report, recommendation, and

22     addendum?

23          MR. GINSBERG:  He has, your Honor.  He's discussed it

24     with me, and he's also discussed it with Mr. Bienert and

25     Mr. Bisconti.

1    THE COURT:  All right.  Does the defendant have any

2  objections to the facts set forth in the presentence report?

3    MR. GINSBERG:  Not in the offense section.  We did

4  raise a number of objections to the enhancements, your Honor.

5    THE COURT:  All right.  Does the government have any

6  objections to the facts set forth in the presentence report?

7    MR. IMPERATORE:  No, your Honor.

8    THE COURT:  All right.  I adopt as my findings of fact

9  the facts set forth in the presentence report.  I will now hear

10  Mr. Ginsberg with regard to the sentencing enhancements.

11    MR. GINSBERG:  Thank you, your Honor.

12    Your Honor, I really want to focus orally today on two

13  enhancements.  They've been briefed pretty substantially on

14  both sides, and I don't want to repeat them.  There have been

15  citations to cases and parts of the transcript of the case.

16  The two that I want to talk about today are the two points for

17  leadership role and the two points involving the bankruptcy

18  proceedings.  I'll take the bankruptcy proceedings first, your

19  Honor.  It's -- yes.

20    THE COURT:  Let me ask you, just so we can do this in

21  an orderly fashion --

22    MR. GINSBERG:  Sure.

23    THE COURT:  -- are those your objections to the

24  guideline calculation?

25    MR. GINSBERG:  No, we have the other objections --

1          THE COURT:  You have the amount of loss, which is

2     preserved.

3          MR.  GINSBERG:  Right.  We have other objections which

4     were set forth in the defendant's submission, which includes an

5     objection to sophisticated means, ten or more victims and the

6     bankruptcy, which I just mentioned, and the leadership role,

7     and also there's objection to the two additional points for

8     obstruction based on either documents or testimony.

9          THE COURT:  All right.  Well, this is what I need to

10     know because, as we all know, positions can change.  So I need

11     to know -- it's not enough that something is in your papers.

12     If you're objecting to something, I need to know that.

13          MR.  GINSBERG:  Yes, your Honor.

14          THE COURT:  And then how you construct your argument

15     is a different story.  So go ahead, if you will, Mr. Ginsberg.

16          MR.  GINSBERG:  Yes.  So we do object to the two

17     additional points for sophisticated means.  We object to two

18     additional points for ten or more victims.  We object to two

19     points for the issues with the bankruptcy proceedings.  We

20     object to two points for the leadership role.  And we object to

21     the two points for obstruction of justice.

22          THE COURT:  All right.  Thank you.  You're free to

23     argue or rest on your papers for any or all of that.

24          MR.  GINSBERG:  We would rest on our papers except for

25     two issues that I mentioned earlier, and that is the bankruptcy

1  proceedings and the leadership role.

2          THE COURT:  All right.  Now, I'm just having a -- I

3  want to make sure I'm getting things right here, and I may need

4  help from the government on it.  The government has vigorously

5  argued for a two-level adjustment for obstruction of justice.

6  Is that correct?

7          MR. IMPERATORE:  Yes.

8          THE COURT:  All right.  But the presentence report

9  itself does not include a two-level adjustment for obstruction

10 of justice; is that correct?

11         MR. IMPERATORE:  That's correct, and probation has

12 explained that that is consistent with its practice to defer to

13 the trial judge.

14         THE COURT:  All right.  Thank you.

15         Go ahead, Mr. Ginsberg.  Sorry, I just wanted to get

16 that clarified.

17         MR. GINSBERG:  That's fine, your Honor.

18         So our position regarding the bankruptcy proceedings

19 doesn't necessarily go to the merits of that proceeding itself

20 and what took place.  Our position as set forth in our

21 submission is that that proceeding had nothing to do with the

22 transactions in this case or anything that could be viewed as

23 relevant conduct.  It's totally separate and apart from what

24 took place here, and unless it was part of this case or somehow

25 relevant conduct to what took place here, whatever took place

1    in the bankruptcy proceeding, Mr. Bergstein should not receive

2    an enhancement for those issues, and it should be viewed as

3    something that's separate and apart from what this case is

4    about and what any of the enhancements apply to in this case.

5           So our position was set forth further, there were

6    citations, but essentially that's our position.  And we don't

7    think that there was anything in the record of the trial that

8    could connect it up, and even if there's something that the

9    government has to say about it, which they did raise in their

10   papers, we don't believe, in any event, they would be able to

11   satisfy the burden even at this proceeding so that the Court

12   should grant the two-point enhancement.

13          THE COURT:  Correct me if I'm wrong, but the argument

14   is that the entity that purchased the claim from the Stephens

15   interest was CAC, I believe, and it was a company controlled by

16   Mr. Bergstein, and this was during the course of the

17   conspiracy.  It was falsely represented to the Stephens

18   interest that this was a company under the control of Weston

19   when, in truth and in fact, it was not.

20          Why is that not evidence of the charged conspiracy?

21          MR. GINSBERG:  Just because there was some connection

22   between Weston and one of the entities involved in the

23   bankruptcy proceeding does not per se mean that it was involved

24   in the conduct charged in this case or in relevant conduct

25   regarding this case.  We think that it still stands separate

1    and apart.  Weston could have been involved in any number of

2    other transactions with any of those other entities or maybe

3    even Mr. Bergstein, but if it wasn't part of the conduct

4    charged in the indictment and proved up at trial or relevant

5    conduct to those charges, then we think it still is outside of

6    the scope of what should be considered.

7              THE COURT:  I would have to say I agree generally with

8    the concept you lay out that, for example, if it's 404(b)

9    evidence, I would not be persuaded that it could be used as the

10   enhancement.  It may be admissible evidence in the trial, but

11   it's not evidence of the charged conspiracy.  I didn't

12   understand you, in fact, I think you made yourself clear that

13   you were not limiting yourself to the four corners of the

14   indictment itself, but relevant conduct of the charged crime.

15             MR. GINSBERG:  Yes, I think I need to --

16             THE COURT:  Right.

17             MR. GINSBERG:  -- because if your Honor ruled it was

18   relevant, then there's --

19             THE COURT:  Right.

20             MR. GINSBERG:  -- then it might be permissible, but

21   I'm not.

22             THE COURT:  All right.  Let me hear from the

23   government that bears the burden on the enhancement.

24             MR. KOBRE:  Yes, your Honor.  So if I could address

25   this.

1          THE COURT:  Sure.

2          MR. KOBRE:  The bankruptcy, the lies in the course of

3    the bankruptcy were an inherent part of the conspiracy.  The

4    defendant basically embezzled the money by lying or in

5    connection with the lies that he himself told and that he

6    enlisted his coconspirator Keith Wellner to tell about his

7    connection to who was purchasing the claim from Stephens.  So

8    it's directly --

9          THE COURT:  Where did the money that CAC used to buy

10   the claim come from?

11         MR. KOBRE:  Your Honor, I believe it came from

12   originally from TT to Swartz IP and then was used to purchase

13   the claim by Mr. Bergstein, so it was the same -- the proceeds

14   of the fraud went through Swartz IP from TT to CAC -- I'm

15   sorry, to Stephens to purchase the claim through CAC.  And I

16   would also note, your Honor, not only did Mr. Bergstein enlist

17   Keith Wellner to lie about where the money was coming from, he

18   also enlisted Mr. Wellner to lie and to say that, in fact, it

19   was CAC that was purchasing this claim, and, in fact, of

20   course, it was not.

21         THE COURT:  All right.  Now, to hone it in to the

22   precise objection, how is this evidence of the charged

23   conspiracy or one of the other counts of conviction?  How did

24   the lies told to Stephens about -- I think the email said

25   something about, oh, well, Wellner is an attorney.  He's the

1  chief operating officer of one of the Weston entities, and this

2  will be under the control -- or CAC is under the control of

3  Weston.  That's what I'm recalling from the evidence, and if

4  I'm wrong, I ask to be corrected about that.

5          MR. KOBRE:  No, your Honor's correct about that email.

6          THE COURT:  Explain again how that goes to prove any

7  of the counts of conviction.

8          MR. ALLEN:  Well, your Honor, I mean, the conspiracy

9  here includes stealing the money or defrauding Weston of its

10  funds, and part of the way that that occurred was by lying

11  and -- by lying to Stephens about where the money was coming

12  from.  So the money was, in fact, proceeds -- part of the

13  fraud.  And in order to direct that money to Stephens, there

14  had to be a lie; otherwise, Mr. Bergstein could never have

15  repurchased the claim in bankruptcy.

16          THE COURT:  Well, the lie may go to whether it

17  qualifies as an enhancement, but if I'm correct, under your

18  theory, showing that the TT money was used to confer a personal

19  benefit on Mr. Bergstein, if he took the money and gave it to

20  his favorite charity, would that not also be evidence of the

21  crime charged?

22          MR. KOBRE:  Well, your Honor, I think --

23          THE COURT:  It might not qualify for an enhancement.

24          MR. KOBRE:  Right.

25          THE COURT:  But it would be evidence of the crime

1  charged, wouldn't it, showing how money that originated from TT

2  was used for the benefit of Mr. Bergstein?

3  　　　　MR. KOBRE:  Yes, your Honor, and I think -- but I

4  think here you have some -- the additional fact of

5  Mr. Bergstein enlisting his coconspirator as part of the scheme

6  to lie to Stephens and lying, himself, to Stephens as well.

7  　　　　THE COURT:  All right.  That is the issue,

8  Mr. Ginsberg, and I'll give you a chance to respond.  It would

9  seem that evidence of tracing TT money going for the benefit of

10  Mr. Bergstein would be evidence of the crimes charged in the

11  indictment, not a basis for an enhancement yet, but if the

12  particular manner in which the money was used involved a

13  misrepresentation in connection with the bankruptcy proceeding,

14  then it arguably qualifies for that enhancement.  So if you

15  would like to address that, I'd be happy to hear you.

16  　　　　MR. GINSBERG:  Yes, your Honor.  I think maybe the

17  best term to use is I think the fact of the participation of

18  Weston in this and Wellner making certain statements and then

19  combining them up with money that was passed through and that

20  Mr. Bergstein may have lied about, it conflates what was taking

21  place.  And just because those parties are present in the

22  bankruptcy proceedings in one form or another doesn't -- in our

23  view does not necessarily tie it into the conduct here, either

24  in the strictest sense in the charged conduct or the relevant

25  conduct.

1       I would also say to the Court, while the government is

2   free to now argue whatever version they believe is sufficient

3   to make this enhancement applicable, if they had that position

4   during the course of the trial, knowing the charges in the

5   indictment that were being presented to the jury, having the

6   witnesses available to testify to these facts, and connect them

7   all up in some way that would have shown, putting aside talking

8   to the jury because they made their decision, shown to your

9   Honor even during the course of the trial that there was a

10  connection, I think the Court would have seen it and then would

11  be able to make that decision.

12      They did not do that, and I think what they're saying

13  here doesn't rectify that and isn't sufficient to establish it.

14  At worse, I don't want to concede anything, but I think at

15  worst here, if I may, I'll say it's a toss-up, and if it's a

16  toss up in this instance, I think in baseball the phrase would

17  be the tie goes to the runner.  But if it's a toss-up, I think

18  the benefit of the decision goes to Mr. Bergstein.

19      Thank you.

20      THE COURT:  All right.  I find on these facts that the

21  two-level enhancement under 2B1.1(b) (9) (B) is warranted

22  because there was a misrepresentation made.  It was in the

23  course of a bankruptcy proceeding.  It was in connection with

24  the fraudulent purchase of a bankruptcy claim from Stephens

25  during the course of the conspiracy by an entity under the

1    control of Bergstein, Bergstein and Kia Jam, and that the

2    moneys obtained from TT, the TT loans, were used, in part, to

3    finance the purchase of the claims.  So I find that the

4    enhancement applies here, and I propose to give the

5    enhancement.

6              I'll hear you on other --

7              MR. GINSBERG:  The leadership role, your Honor?

8              THE COURT:  Yes.

9              MR. GINSBERG:  I think the leadership role argument

10   comes down to what we believe is the failure to demonstrate or

11   prove that Kia Jam was a coconspirator or involved in this

12   conspiracy.  The case law not only suggests, but I think it

13   tells the Court, that a person being supervised or led by

14   someone who's an enhancement is proposed for needs to be part

15   of the criminal activity; otherwise, you could have a situation

16   where some individual who has five or six people working in his

17   office or her office in a legitimate capacity are asked to send

18   documents or answer phone calls that arguably they could be

19   made to be people that were supervised, but they have to be

20   supervised and part of the criminal conduct.

21             And we believe, in this instance, Kia Jam was not in

22   that capacity.  He had been working with Mr. Bergstein for

23   quite some time in other deals which were totally legitimate,

24   and we think he just was continuing his role, potentially one

25   could say, as the right-hand man to assist Mr. Bergstein.  But

1  he did not participate, nor was he a criminal conspirator in

2  this case.  And because of that, even though there was the

3  relationship with Mr. Bergstein and Kia Jam, it doesn't qualify

4  for this enhancement.

5         THE COURT:  All right.  Let me hear from the

6  government.

7         MR. KOBRE:  Your Honor, I think the trial evidence

8  showed well beyond a preponderance that Kia Jam was involved in

9  the criminal activity here as a coconspirator.  We cite in our

10 submission the emails and other government exhibits showing

11 that Mr. Jam executed numerous of the documents here, including

12 not only sort of the deal documents but also the requests, the

13 subsequent multiple subsequent requests for money that was

14 going to be disbursed by Weston and then received that money

15 through Mr. Bergstein and through a number of his various

16 entities and used it for other purposes.

17        I think inherent in the Court's rulings allowing

18 statements of Mr. Jam as coconspirator statements sort of

19 speaks to that as well.  So I think the trial evidence showed

20 well beyond a preponderance that Mr. Jam was a coconspirator

21 and that Mr. Bergstein, in fact, directed him as the exhibits

22 show.

23        THE COURT:  Well, tell me how he directed Mr. Jam.

24        MR. KOBRE:  So, your Honor, we cite in our submission

25 emails where he's directing Mr. Jam to sign various documents,

1    to PDF them, to send them to people at Weston, directing him

2    how the money should be -- how various moneys should be -- and

3    how various moneys should be disbursed.  It's on page 23 of our

4    submission.

5         THE COURT:  I conclude that the enhancement has not

6    been made out in this case.  I think the government has proven

7    by a preponderance of the evidence that Kia Jam was a knowing

8    participant in the conspiracy.  However, the so-called

9    directions that may read as directions are, to my mind, a

10   manner of speaking to a coconspirator who was -- at least it

11   was ambiguous to me whether they were of equivalent rank or

12   not.  It may be that Mr. Jam was not as well off or well

13   connected as Mr. Bergstein, but there was a lot of evidence in

14   the case that they were teamed up in business deals and that

15   Mr. Jam was no, at least the way I heard the evidence, no

16   office boy here, no subordinate, but was a free agent who

17   benefited from this conspiracy and received moneys from this

18   conspiracy.

19        So I don't see this, based on my view of the evidence,

20   that the defendant was an organizer, leader, manager, or

21   supervisor in relation to Kia Jam, and despite the terse manner

22   in which some of the communications to Mr. Jam were phrased.

23   And so, accordingly, I find that the adjustment under 3B1.1 has

24   not been established.

25        Mr. Ginsberg.

1        MR. GINSBERG:  I indicated those were the two issues

2    we wanted to argue.  Your Honor did point out that the PSR does

3    not include the two-point enhancement for obstruction of

4    justice, although the government argues for it.  That's one of,

5    I've always felt, one of the more difficult issues to argue at

6    sentencing because it really rests upon a subjective view by

7    the Court, which is really a finder of fact as to that issue as

8    opposed to the jury being a finder of fact on the guilt or

9    nonguilt of the defendant.  Your Honor heard the testimony, of

10   course, and there were documents presented, but our view is and

11   I know this has been argued to the Court before, simply because

12   Mr. Bergstein testified and believed certain things to be true

13   and accurate as he was testifying about them and the jury

14   ultimately apparently didn't agree with his view of things does

15   not necessarily rise to a level that requires the Court to give

16   a two-point enhancement for obstruction of justice.  And one of

17   the main reasons why it doesn't and it shouldn't and the cases

18   speak to this is because if it was an automatic two-point

19   enhancement when a defendant testified and he was then found

20   guilty, there would be an extreme chilling effect on any

21   defendant who wished to testify because it could be said that

22   automatically if he's convicted, it implies that he didn't tell

23   the truth and he lied, but that's not always the case.  It's

24   just a different view taken by a jury and now by the Court.

25        So that's our position on that enhancement that the

I6RHBerS

1    government has put forward, but basically, the probation

2    department, I think, fair to say just passed on it.  They

3    didn't really take a position one way or the other.

4         THE COURT:  I will say, Mr. Ginsberg, I think you're

5    correct in the general description of the law that the mere

6    fact that a defendant takes the stand and is then convicted is

7    not a reason to impose an obstruction of justice enhancement.

8    There can be an honest misrecollection, there can be a

9    misunderstanding.  Import of the question, there can be -- it

10   may be that the defendant testifies truthfully, but the facts

11   give rise to a conviction.  I had such a case where I found the

12   witnesses' testimony to be truthful, but it resulted in a

13   conviction nevertheless.  So there are a lot of reasons why the

14   enhancement does not apply.

15        Here, I read the government quite clearly that there

16   are two pillars to the enhancement.  One of them relates to the

17   testimony of Mr. Bergstein, the other does not.  I'll hear from

18   the government.

19        MR. IMPERATORE:  Yes, your Honor.  The application of

20   this enhancement for obstruction of justice is not a close

21   question, and it has been proven well beyond a preponderance of

22   the evidence.

23        Your Honor is correct that there are at least two

24   pillars here.  There's actually a third as well.  So the three

25   independent bases for applying an obstruction of justice

1    enhancement are, first, false testimony under oath before the

2    SEC in February of 2012 -- excuse me, February of 2013; second,

3    the creation and use of false, fabricated documents at trial;

4    and, third, the defendant's own trial testimony.  The Court

5    could find hypothetically any one lie --

6              THE COURT:  Give me the SEC testimony, if you will.

7              MR. IMPERATORE:  Sure.

8              THE COURT:  In what respect?  It was in your brief,

9    but --

10             MR. IMPERATORE:  Yes, your Honor.  This was at

11   pages 2800 to 2803 of the transcript.  In short, Mr. Bergstein

12   repeatedly provided testimony to the SEC.  He was asked

13   numerous questions by the SEC about specific uses of funds,

14   both Partners 2 money and TT money, and he was asked the

15   open-ended question, what was that money used for?  And he

16   repeatedly answered for Pineboard or for medical billing.  The

17   objective evidence, the tracing analysis that was done, proves

18   that money was not used in that fashion, that Mr. Bergstein

19   misappropriated those specific disbursements, either in part or

20   in whole.

21             So any one of those false pieces of testimony before

22   the SEC, which are all in the trial record, would be alone an

23   independent basis for applying this enhancement, and there is

24   so much more.  Mr. Ginsberg has made the argument that this is

25   based on some subjective determination of the Court.  That's

1   really not true, and that belies the facts here.  And I want to

2   just give the Court one example of this that I think the Court

3   can hang its hat on in finding an obstruction enhancement.

4   We've cited five examples of categories of testimony that

5   Mr. Bergstein gave as a witness in this trial that are

6   demonstrably false for, among other reasons, the fact that they

7   are contradicted by Mr. Bergstein's own words in real-time as

8   he was committing the scheme.

9              So just to give your Honor one example, and this is on

10  page 27 of our sentencing submission, Bergstein denied from the

11  witness stand that he knew TT was a feeder fund to Tewksbury.

12             THE COURT:  Well, he was quibbling over the words he

13  would say.  He said "feeder fund" has a specific meaning, and

14  you could read his answer as quibbling over whether the

15  definition of -- or sparring, whatever word you want to call

16  it, over whether or not that was a true feeder fund.

17             MR. IMPERATORE:  If that were the case, your Honor,

18  that might be true, but here he just stated, I don't agree it's

19  a feeder fund, and that was directly contradicted by his own

20  statement in Government Exhibit 246, an email that Tewksbury

21  was a feeder fund.

22             Another example which your Honor --

23             THE COURT:  Well, you do have a point there.

24             MR. IMPERATORE:  And then this is one your Honor has

25  already effectively -- I don't want to say, your Honor's

1  already ruled on it, but your Honor has observed facts already

2  that go to this.  CAC Group's independence.  Mr. Bergstein

3  flatly denied during his trial testimony that he controlled CAC

4  Group.  Mr. Wellner testified that CAC Group was controlled by

5  Mr. Bergstein and he, in fact, sent an email in which he made

6  clear that he was considering using CAC Group to purchase the

7  claim of a disgruntled investor.

8          THE COURT:  Was it solely Mr. Bergstein or was it

9  Mr. Bergstein and Mr. Jam?

10         MR. IMPERATORE:  Well, in the case of the Stephens --

11         THE COURT:  CAC.

12         MR. IMPERATORE:  In the case of CAC, Mr. Wellner

13  testified that it was solely Mr. Bergstein who was directing

14  him to lie to CAC.  So any one of these examples is sufficient

15  to prove by a preponderance of evidence, and we haven't even

16  gotten to the documents yet.  I'm happy to answer any questions

17  the Court has, but there's overwhelming evidence that proves

18  well beyond a preponderance that Mr. Bergstein fabricated three

19  types of documents for anticipated use in trial.  They involve,

20  among other things, fabricating documents that metadata proved

21  were created after the fact, documents that were never produced

22  to the SEC, and documents that his counsel in fact intended to

23  use at least one of them to cross-examine a government witness.

24         So all of these, any one of those documents, any one

25  of these snippets of testimony would be sufficient.  They all

I6RHBerS

1  easily prove beyond a preponderance that this enhancement

2  applies.

3          THE COURT:  Anything you want to say in response,

4  Mr. Ginsberg?

5          MR. GINSBERG:  No, your Honor.  I rely upon our

6  submission.

7          THE COURT:  All right.  I find that the obstruction

8  enhancement applies, and I found the sequence of events with

9  regard to the documents obtained from Evan Warshawsky to be

10  particularly distressing and probative of an obstruction of

11  justice.  These were documents that were produced to the

12  government during the course of trial that had not previously

13  been produced as part of the productions previously in the

14  case.

15          But that isn't what makes it obstruction.  What makes

16  it obstruction is what transpired between Mr. Bergstein and

17  Mr. Warshawsky, how we learned at the hearing how Mr. Bergstein

18  personally called Mr. Warshawsky around January 31, 2018, then

19  asked Warshawsky to search for anything related to Kia Jam or

20  Arius Libra and met with Warshawsky in person on February 1 and

21  asked him to look for documents.  And lo and behold, he found

22  the documents that afternoon.  And it turns out that in

23  December of 2017, at the time that Mr. Bergstein was asking for

24  documents, Mr. Bergstein paid him $25,000.  And when asked what

25  this was all about, the witness said that it was about invoices

1  that were outstanding from 2015/2016.  He could not say how

2  many there were.  And when asked what his best recollection was

3  of the total amount of the invoices, the witness said, "Hmm, it

4  was probably more like a payment on account.  I don't think it

5  was tied to specific invoices.  And I had asked him if he was

6  able to pay the balance.  I knew he had just closed a deal, so

7  we would have cash available.  So I asked him if he was able to

8  pay that, and he did so."

9         The documents that were produced were poor forgeries.

10  They were produced directly to Mr. Bergstein; they were given

11  to Mr. Bergstein.  And the witness testified that after he

12  scanned them, he then threw them out so that when the

13  government subpoenaed the originals, they were no longer

14  available.

15         Mr. Warshawsky did not have the sophistication to know

16  what documents to create, and in one instance, one of the

17  documents would have been used to rebut the testimony of one of

18  the government cooperators, Mr. Wellner, on a fairly

19  substantial point.  And I do note that the documents were not

20  offered into evidence by the defendant, even though the Court

21  said and explained why, because of Warshawsky's testimony,

22  though the Court didn't believe Warshawsky, the jury was

23  entitled to hear it, and the documents would be admitted.

24         And wisely, counsel did not offer those documents

25  because it would have opened Mr. Warshawsky to a devastating

1   cross-examination, I suspect, but the obstruction of justice

2   was complete when Mr. Bergstein handed those documents to his

3   counsel, having received them from Warshawsky with knowledge of

4   their fabrication and with the intent that his counsel,

5   ignorant of the true facts, would produce them to the

6   government as he did.

7           I also find the obstruction is warranted with regard

8   to the defendant's testimony in the trial before me, and he

9   certainly, as far as I am concerned, knowingly and

10  intentionally lied in front of the jury on a number of

11  subjects, including about purposes of payments.  And in that

12  regard, I rely on the government's memorandum at pages 27 and

13  28 to demonstrate that.  And further, I conclude the government

14  is correct about the perjury before the SEC.  So the

15  obstruction of justice enhancement is warranted in this case.

16          Mr. Ginsberg, anything else you want to argue on the

17  guidelines?

18          MR. GINSBERG:  No, your Honor.

19          THE COURT:  All right.

20          MR. GINSBERG:  Thank you.

21          THE COURT:  With regard to the number of victims, this

22  is a very different situation than where you have an entity

23  such as a corporation.  There is a shared ownership in the

24  corporation, but the corporation has an existence unto itself

25  and a purpose unto itself.  That's not so with what we're

1   dealing with here.  The funds are nothing more than investments

2   by other persons, either natural or artificial persons who

3   invest in the funds so that the funds will be applied according

4   to the stated investment purposes.  It is beyond a stretch to

5   say that the investors in the fund are not victims of the

6   fraud, and there were more than ten investors in the two funds

7   combined, so that enhancement is warranted.

8        I find that the defendant is at total offense level

9   33, criminal history category I.  Does the government have any

10  objections to the Court's guideline calculation?

11       MR. IMPERATORE:  No, your Honor.

12       THE COURT:  Thank you.

13       I'll now hear -- and I have the defendant's

14  objections, right, Mr. Ginsberg?

15       MR. GINSBERG:  You have our objections, both in

16  writing and then we -- you elicited from me each objection

17  and --

18       THE COURT:  You did.

19       MR. GINSBERG:  -- and I only addressed certain ones.

20       THE COURT:  You did.  Thank you.

21       So having determined the guideline calculation, I will

22  now hear from you, Mr. Ginsberg.

23       MR. GINSBERG:  Thank you, your Honor.

24       As your Honor is fully aware, this is always one of

25  the most difficult, if not the most difficult, part of any

criminal case, although somebody pleading guilty or a jury

finding them guilty is difficult.  This is the time when

somebody's fate is determined in the sense of their freedom and

whether they will be able to be free now or they will serve a

period of time in jail which will affect, of course, their own

lives and the lives of many other people.  So because of that

and because of the cases that have come down subsequent to the

guidelines originally being put into place, essentially, the

Court is directed to take a holistic approach to what the

appropriate sentence should be in determining what is

sufficient, but not greater than necessary.

        We are all aware of all the factors that your Honor

has to take into account, and to simplify some of them right at

the beginning, we do not in any way minimize the seriousness of

the conduct that took place here, nor the effect on the

individuals.  We don't minimize the need for the Court to set

out a punishment that respects the law and justice, and so

those things are essentially a given pretty much in every case,

but we want to be clear to the Court that we don't contest

those kinds of issues here.

        What I primarily want to speak to today is the David

Bergstein that your Honor did not hear very much about during

the course of the trial but read about, to some extent, in the

probation report and, to a larger extent, in the defendant's

submission and the letters that were submitted along with them.

1          I also want to say at the beginning, based upon the

2     defense's hopeful and optimistic calculation of the guidelines,

3     there was suggestion in the sentencing submission that a

4     sentence of zero to six months would be appropriate.  In

5     consideration of the Court's determination of what the

6     guidelines are, which we must accept, as we do, and

7     acknowledging what those numbers are and balancing them against

8     Mr. Bergstein's other characteristics under 3553, it is our

9     view that a sentence of three to four years would be

10    appropriate; but in no event -- if the Court doesn't believe

11    that's sufficient, in no event do we believe that a sentence of

12    greater than five years is necessary.  And I will speak to that

13    as I proceed.

14         Your Honor knows the facts of this case very well, not

15    only because your Honor heard and saw from the witnesses, but

16    really the last two days, Monday and Tuesday, your Honor heard

17    significant portions of what was testified to at trial for

18    different reasons, the loss amount, who was involved, who did

19    what.  And we don't want to dwell on that.  I just want to

20    comment, in terms of that, repeating the history of this case

21    and the players in the case, it wasn't initiated with

22    Mr. Bergstein, but that doesn't mean he's not culpable and not

23    responsible.  There was the beginnings of something that took

24    place, which I guess we would suggest was untoward at the

25    outset, between Mr. Hallac who had his connection to Weston,

1    Mr. Galanis, and Gerova.  As it played out, Mr. Bergstein

2    became part of that initial circle of individuals, and his

3    conduct established here as fraudulent is now part of what we

4    have to deal with at sentencing.

5            But there is, I think, something to be said for how

6    this began, particularly your Honor heard from Mr. Hallac about

7    what he did, signed the cooperation agreement, but what he did

8    and what his role was.  Mr. Galanis is now, as I understand it,

9    a twice-convicted felon for fraud, having been in jail and then

10   received another sentence while he was serving the first

11   sentence, and --

12           THE COURT:  First sentence I imposed.

13           MR. GINSBERG:  Pardon me?

14           THE COURT:  I was the sentencing judge on the first

15   case.

16           MR. GINSBERG:  Yes.  And then I think Judge Abrams was

17   the sentencing judge in the other case.

18           THE COURT:  Yes.

19           MR. GINSBERG:  And Gerova, it was really hard for me

20   as I read through everything and tried to look back at the

21   history of Gerova, both through the record here and what I

22   could see online, you know, there was a financial crisis, but

23   how Gerova's stock value plummeted the way it did and whether

24   that was something that in some way was at least known to

25   Mr. Galanis, if not to Mr. Hallac, that there was this

1  instability in the business and it could lead to that

2  happening.  I asked the Court to consider that in some part.  I

3  don't want to suggest in any way, again, to minimize

4  Mr. Bergstein's role as it came to play later on.  I want to

5  move past those facts, and I want to talk a little bit about

6  what the government has said and then independently what we

7  said and why.

8          The government spent most of their sentencing

9  submission, as I guess they often do, on the facts of the case.

10  The facts of the case led to a conviction.  We knew that.  The

11  Court knew that.  The Court heard those facts.  I think it was

12  20 pages of the government's submission recited the facts over

13  again.  Reciting those facts over again doesn't make the charge

14  and the conviction any more serious.  It doesn't take away the

15  need for the Court to impose a sentence because of the need for

16  specific and general deterrence, and all those other factors.

17  So while the government has a right to do that, placing before

18  the Court all those facts, in addition to the fact that those

19  facts were recited in the presentence report, which essentially

20  came from the government, although there was a trial transcript

21  to be used, I don't think advances the ball that much in a

22  sentencing proceeding.

23          I think we know that since we concede all of that, we

24  need to look at other factors and then we need to look, I

25  believe, very carefully at how the government tried to portray

Mr. Bergstein even with all of his good deeds that have been

mentioned in our submission and in the letters.  Not only do

they give short shrift to them, it's almost as if in some

places they're suggesting that the positive should be viewed as

negatives.  And I want to talk about those, both because the

government raised them and because we believe there are

positive factors that your Honor should consider.

To begin with, the government talked about

Mr. Bergstein's lifestyle.  That's something that frequently

comes out during the course of a trial, particularly in

white-collar cases, both because it may have some relevance to

the charges and also, not necessarily improperly, but because

it clearly could have an impact on a jury in their

determination of the facts.

But in this instance, the government took it one step

further.  And besides the fact that they sort of minimized how

he began growing up in projects with his father and then they

were eventually able to move to Teaneck and live a better life,

they now point to his current life and his current family and

say that they're better situated than most to absorb the impact

of the conviction on Mr. Bergstein and his absence from his

family's life outside of jail for a period of time, his absence

from his wife's life and his absence from his children's life.

And they seem to suggest that just because the Bergstein family

may have more money than many other people, it's not going to

1  have the same effect on this family as convictions may have on

2  other people's families.

3        And I suggest to your Honor that that's in some way

4  almost a perversion of what happens to families when they have

5  a member of the family convicted and put away in jail and

6  removed from the everyday life of the other members of the

7  family, and I think that particularly true here because

8  Mr. Bergstein, who made a choice in his life not to have

9  children until a later stage, which these days a lot of people

10 do, now at 55, going on 56 years old, has a 9- and 11-year-old

11 child.  Very formative years for those children.  And any

12 amount of time that Mr. Bergstein is in jail and removed from

13 their everyday life will have a significant impact on them.

14 And I'm not going to stand up here and give a psychological or

15 psychiatric analysis of what can happen.  I think the Court is

16 well aware, with all the sentences your Honor has imposed and

17 reading various reports and even from life experience, what

18 kind of an impact having a father, and in this case a father

19 who was very close with his children, who changed his life from

20 this -- he was always a hard-charging businessman, but slowed

21 it down and tried in many ways to participate less in the

22 everyday business functions and more in the everyday activities

23 of his children.

24        He's going to be removed from those children's lives

25 on a daily basis if your Honor accepts our suggestion for three

1    years, four years, or no more than five years.  That's a very

2    significant impact.  To minimize it in the way that the

3    government did, which they're entitled to do, I think misses

4    the point and misses the ultimate issue of the separation that

5    incarceration imposes, both on the defendant and on the family.

6            Mr. Bergstein took great pride in his family

7    responsibilities.  Not only did he participate in the lives of

8    his two children, but in doing some of the things that he did

9    in the community.  He did them not only because he thought it

10   was appropriate and beneficial for the community, but he did

11   them both out of his own spirit and his religious beliefs to

12   demonstrate to his children how somebody should live their life

13   and how somebody, who has the fortune that he had, should use

14   that to give back to the community and to give back to others

15   who are less fortunate.  And all of the letters submitted to

16   the Court in one way or another speak to that issue.

17           And again, the government, in addressing the letters

18   that were submitted to the Court, selectively mentioned, I

19   think, three or four letters of people who wrote and said that

20   they benefited from knowing Mr. Bergstein, from being in

21   business with him, from having his friendship, but also earned

22   money or earned a living and in one case charitable

23   contributions.

24           The government suggests that those three or four

25   people out of the other 30, 40, 50 people who wrote letters

1  received money, whether it was salary or otherwise, from the

2  fruits of the crime here; and, therefore, it shouldn't be

3  counted that they say that Mr. Bergstein is a good man, that

4  they knew him as a friend, they knew him in business, and they

5  were able to lead their lives because he financially assisted

6  them.

7  I thought it was particularly inappropriate to pick at

8  the rabbi who received money, and I think it was used for

9  community purposes, charitable purposes, because he had

10  received money when none of this was happening, meaning this

11  instant case, when Mr. Bergstein was earning money from all of

12  his enterprises that were not criminal conduct and that he was

13  still making those charitable contributions and assisting them

14  financially in all kinds of ways. And to isolate those three

15  in the way that was done just, to me, I think it was not

16  necessarily appropriate.

17  I don't like to use some of the uncivil terms that we

18  may have heard yesterday in the courtroom, but I'll use that

19  term for this purpose. And to take it one step further and to

20  show the way the government is trying to twist who

21  Mr. Bergstein is in his whole life and have the Court only

22  focus on this case, they took quotations from a tape recording

23  from the jail between Mr. Bergstein and his best friend for

24  almost his entire life. And they cited, I think it was, four

25  particular sentences, and they cited it right after they said

that Mr. Bergstein was still involved in the kind of conduct

charged in this case because he's dealing with investors and

trying to get them to invest in new projects or schemes.

And when I saw that, not having heard the tape before,

I looked at those four quotes.  I didn't think they were --

first of all, I didn't think they were particularly on point

because it was -- the quotes really represented Mr. Bergstein's

hope and optimism that he wouldn't get a long sentence, that he

might get bail, that when he did get sentenced, he would be

moved from the New York area to California to be near his

family, and that was what that was about.  But if you listen to

the tape, it even undercuts what the government says further,

because it was a ten-minute-and-something-second tape, and I'd

say it's fair to say for half of that time Donnie, his best

friend, is crying and upset about Mr. Bergstein, his wife, his

children, what's going to happen to them.  And he feels so

terrible about that, and that he doesn't feel like there's

anything he can do.

And Mr. Bergstein, on the other end of the phone, in

the MCC, in jail for the first time in his life, in his prison

uniform, is saying to Donnie:  Don't worry.  Things are going

to be OK.  You have to remain optimistic.  You have to remain

hopeful.  You have to believe in your God.  And apparently

Donnie is Catholic, Mr. Bergstein is Jewish, but they both have

an abiding faith in their religion and their God.  And that's

1   what that conversation was about.  If you listen to the whole

2   conversation, there's no other way you can interpret it.  And

3   to take those quotes out and to then force them into something

4   involving Mr. Bergstein trying to continue a scheme or begin a

5   new scheme with investors from the jail is just way, way out of

6   line.

7          And the government chose to do it for whatever reason,

8   and they chose to take those quotes and not put the whole

9   transcript in for whatever reason, but I think that speaks to

10  the way that they're approaching this case.  We, obviously,

11  approach it in a very different way.  We approach it conceding

12  the conduct, conceding that it's serious, understanding the

13  Court's responsibility to mete out punishment, but wanting the

14  Court to really look at all the 3553 factors and

15  Mr. Bergstein's entire life.

16         And one more thing from what the government said, and

17  then I'll move on to the good acts and deeds that Mr. Bergstein

18  has performed throughout his life and the person that he is.

19  And I didn't understand this at all because the government at

20  page 33 of their submission, in responding to the defendant's

21  request for the Court to consider recommending the RDAP

22  program, the government says that it was a thinly veiled effort

23  to convince the Court to recommend RDAP, a thinly veiled

24  effort.  And then I looked back at the probation report because

25  I was concerned that maybe I had forgotten what was in the

1    report and maybe the government had a point here, but when I

2    looked at the probation report and I looked at, I believe it's

3    paragraph 136, it's seven, eight, nine, ten sentences about

4    Mr. Bergstein's use during a substantial period of time of

5    narcotic substances and alcohol.  And, in fact --

6             THE COURT:  2014 up to 2016, the time of the arrest.

7             MR. GINSBERG:  Yes, your Honor.  And it coincides with

8    the period of time where, without going too much in depth about

9    it, because it plays into all the other things that I want to

10   mention, he was in a bad place in his life mentally given the

11   fact that there were a lot of problems, business problems,

12   financial problems.  There was the financial crisis which

13   affected not only Mr. Bergstein but pretty much everybody in

14   the country and institutionally in the country, let alone maybe

15   in the world, but --

16            THE COURT:  Well, that's why he was drinking and

17   started drinking heavily in 2008.  The amphetamines, I got the

18   impression, were a little bit later.

19            MR. GINSBERG:  Yes, that's correct.  But in any event,

20   to suggest that was a thinly veiled attempt to sort of fool the

21   Court, it's just totally inconsistent with what the probation

22   department wrote down and what he told the probation

23   department, unless they're suggesting that Mr. Bergstein made

24   all that up and the probation department was fooled.

25            But the other day, we had a proceeding before we began

the *Fatico* hearing, and I think it's fair to say Mr. Bergstein

at that moment wasn't thinking about the probation report or

what the government said or the RDAP program, and your Honor

asked him questions to make sure that he was -- could

understand and was competent to respond to your Honor's

questions about a conflict issue, and you asked him about his

use of substances.  And he candidly explained essentially

what's in the probation report.  I don't think he was standing

up there, your Honor, coming up with this scheme to support

what he said to the probation department to thinly veil his

argument and to fool this Court.  So I don't even know where

that comes from or how that can be said.

          But it's the totality of all those things that are

taken and twisted in a certain way that try to take your Honor,

I believe, out of all of the good deeds and good things about

Mr. Bergstein and say to your Honor, look, the only thing we

should care about here, and maybe so, because we're the

government is the conduct.  And because of the conduct and the

amount of loss, your Honor needs to give a -- I think their

term was a very substantial term of jail or imprisonment.

          So there are issues with that, and that doesn't mean

it should change your Honor's mind about what the sentence

should be, but I think it should put everything in a proper

perspective.

          Now, going to what we put in our sentencing memo and

1   the letters that were attached to it and some of which, as I

2   said before, were attacked, there is a history here of

3   Mr. Bergstein performing charitable acts, assisting people who

4   were going through divorce, being the first one to show up at a

5   hospital when somebody was in a serious accident and he heard

6   about it first apparently and got there first; counseling

7   people, younger adults who were sort of lost in their lives,

8   had addiction problems, couldn't find jobs, people who were

9   unable to pay rent and needed sort of a foot up to get started

10  in life.  All of that took place over many, many years of his

11  life, and that is why we have 3553 and that is why there's a

12  balance to be performed here and that is why sentences are

13  holistic.

14         All of those things that he did, I think in reading

15  the letters it's fair to read that he did it just out of his

16  own belief in humanity and kindness.  He wasn't expecting, nor

17  did he get in most instances, any return for it.  It wasn't as

18  if he was helping somebody to beat addiction, so that person

19  would get a job and then have a business that would come to

20  Mr. Bergstein with and it was distressed and Mr. Bergstein

21  could make a lot of money out of it.  It was simply because he

22  felt it was the appropriate thing to do.  And the same goes for

23  almost every one of the letters where they're talking about

24  good deeds that he did for the community, for individuals, law

25  enforcement, children particularly.

1          What's also, I think, very important to note here, and

2     to some extent I think it's unusual in a fraud case, and all of

3     us -- well, I should just say myself.  I don't want to include

4     your Honor in this or the government, but we use the term often

5     in the fraud cases, fraudster.  The term certainly can be used

6     for somebody convicted one time for fraud, but really when it's

7     used, there's a suggestion in using that word that that's who

8     that person is.  That person is fundamentally a fraudster and a

9     criminal and has been that person for his entire adult life or

10    most of his adult life.  And sometimes it's even been suggested

11    that, well, this may be his first arrest and conviction, but we

12    all know, wink, wink, that he probably was involved in criminal

13    activity long before this.

14         What we have here, however, and is rare for these

15    cases, because usually in a fraud case, if letters are

16    submitted, it's about the individual's good deeds in the

17    community to balance off against the crime he committed,

18    whether it's the first time or second time.  But here, we have

19    letter after letter after letter of people who David Bergstein

20    did business with, in deals involving 20, 50, 100, or more

21    millions of dollars in each deal, who are writing to the Court

22    to say:  I did business with this man.  I trusted this man.

23    The deal was successful.  He did everything he said he was

24    going to do.  He did his due diligence.  And in the deals that

25    these distressed companies couldn't be salvaged, he did

1  everything he could to keep it at that same level, to make no

2  further losses occur, to help people keep their jobs as long as

3  they could be kept until the company was sold or went out of

4  business.

5          And in one particular instance, somebody came to him

6  and asked him whether they can trust somebody else in a

7  business deal, and Mr. Bergstein said:  I know the person.  I

8  think you can trust him.  And he made a loan.  I think it was

9  maybe 500,000 or may have been less than that.  But the deal

10  went south.  His friend lost his money, and Mr. Bergstein, with

11  no obligation to do so, with no skin in the game, with no part

12  of the deal, gave the money to his friend because he felt that

13  since he vouched for the other individual, he was somehow

14  responsible.  That's not the David Bergstein in all those

15  instances that your Honor heard about in this case.

16          And it is very different than most fraud cases because

17  now the Court is shown over a long period of time, by all kinds

18  of different people, the business aspects and the person that

19  David Bergstein is and what he did in those businesses, how he

20  did it, and how he did it without involving himself in any

21  fraud or criminal activity.  And that's why this is his first

22  conviction, not because ten years ago they didn't catch him.

23  It's because that's not who he is, and that leads to aberrant

24  conduct.

25          Now, aberrant conduct under the guidelines when they

 1    first came into being is a very -- basically, a very strict

 2    interpretation of aberrant conduct.  It really referred to in

 3    and the cases spoke about somebody who for a relatively short

 4    period of time does one thing that's out of character for who

 5    they are, and because of that, the courts were allowed to use

 6    that as one of the very few bases at that time to go below the

 7    guidelines.  At the beginning as your Honor knows, there were

 8    relatively few other than cooperating with the government.

 9            But the aberrant conduct here is not in the narrow

10    definition of how we see it in the sentencing guidelines.  It's

11    aberrant because whether this deal took place over a year or

12    two years or three years, in his lifespan as an adult, in all

13    the things that he did, it is aberrant.  It's not who he is.

14    And the term can be used in that sense as well.  I'm not asking

15    your Honor to apply it as I might have in 1988 as one -- as the

16    reason to give a lower sentence than the guideline, but I am

17    asking your Honor to consider it under 3553 in terms of how

18    different what happened here is with everything else he did in

19    business.  And as your Honor knows, it's very rare that you get

20    to see that, I think, in fraud cases.

21            And I think that really counts for something, because

22    instead of having to speculate and say, oh, this guy's a

23    fraudster, we know he isn't because we see all these letters

24    from all these different people, most of whom have nothing to

25    do with one another but have business dealings with

1   Mr. Bergstein, and that's where the focal point and the center

2   of all that is.

3          As your Honor, I think, alluded to yesterday when

4   Mr. Bienert was talking about the guideline losses, and we sort

5   of, with your Honor's comment and Mr. Bienert's ability to

6   understand what your Honor was saying and then determine that

7   enough had been said about the losses, your Honor suggested, in

8   talking about a recent sentence, that the guidelines aren't the

9   only factor.  And I took from that, since we were talking about

10  loss, and I hope I'm not mischaracterizing, your Honor, but I

11  took from that meaning the guidelines aren't the only factor,

12  and the loss guidelines aren't the only factor.

13         Even if your Honor hadn't alluded to that, your Honor

14  is aware that there's a long history in this district and the

15  Eastern District, other districts in the country, articles

16  written by academics, positions taken by former prosecutors,

17  including former U.S. attorneys and the American Bar

18  Association, all speaking about the loss guidelines and how, in

19  some way or another, they just don't seem to work right.  That

20  picking out these numbers of X millions and attributing points

21  to it really doesn't do justice to how somebody should be

22  sentenced.

23         THE COURT:  I should correct some of what I said

24  yesterday about that.  In the sentencing I was referring to,

25  which you have familiarity with because you represented the

I6RHBerS

1   defendant --

2                MR. GINSBERG:  Yes.

3                THE COURT:  -- it was a combination of the loss

4   guidelines.  It was a factor, and other enhancements that moved

5   the guideline, the bottom of the guideline range, to a level

6   that was -- there were lots of terms that could be used --

7                MR. GINSBERG:  Yes.

8                THE COURT:  -- I'll just go with a plain unrealistic.

9                MR. GINSBERG:  OK.

10               THE COURT:  It was the bottom end of the guidelines

11  was 2,200 months, my recollection.

12               MR. GINSBERG:  I totally understand that, and I

13  understood that yesterday, your Honor.

14               THE COURT:  But it was not just the loss amount in

15  that case.  It was other enhancements that were applicable to

16  the case.

17               MR. GINSBERG:  I totally understand that, your Honor.

18  I wasn't suggesting anything other than that.

19               THE COURT:  No, but I think I had pinned it on the

20  loss amount, and I did so erroneously.  It was not the only

21  factor.

22               MR. GINSBERG:  Well, I didn't take from that, that

23  that was the only factor because I was part -- as you said, I

24  was part of that proceeding.

25               But here we have some very similar -- we're not at

that other number that your Honor said we can categorize in

lots of different ways, but we still have a case where we're

beginning with a base offense level of seven, and because of

the way the loss guidelines still exist, 20 additional points

are added to the base to bring it up to 27.  And I'm not saying

it should be at seven, but at seven with the other

enhancements, it would be 15 points; it would be 18 to 24

months.  With the 20 extra points, it goes up to 135 to 168.

So while it's not -- I can't compare it to what

happened in the Tucker case, it has a very significant impact

on the ultimate outcome here in terms of the guideline

calculation.  And I'm sure I don't need to repeat to this Court

everything that's been said by many other judges about the fact

that I think a lot of people, judges included, have been

suggesting that the commission again revisit the guideline

calculations because they've sort of gone from a point, right

after the guidelines came into being in '87, where politicians

or the public were grousing that white-collar criminals were

getting away with things and would pay the money back and not

get any jail, and it then went to, in changing it, went to what

I think fairly was another extreme the other way.  And it's

come back to some degree, but many people still say it's just

not a good way to calculate a sentence because it just jumps

the numbers up so high.

We also have here, as we did in Tucker, other

1    enhancements.  So it's not just the 20 points, it's all the

2    other enhancements as well.  And that usually occurs in only

3    certain kinds of cases.  It can occur in drug cases where

4    there's a weapon and leadership role.  Those usually are the

5    additional factors.  And in some other cases, there are various

6    characteristics, but it's particularly true in fraud cases

7    because there are so many other potential enhancements that you

8    end up with this sort of -- now I'm going to do a football

9    analogy -- but piling on effect.

10             THE COURT:  I just want to make sure that I was clear

11   before.

12             MR. GINSBERG:  Yes.

13             THE COURT:  I know I said total offense level 33,

14   criminal history category I.  In arriving at that, I did find

15   the ten or more victim level and the bankruptcy level was

16   appropriate, but in addition to rejecting the argument in favor

17   of the leadership enhancement, I concluded that the

18   sophisticated means was not established, although I found that

19   the obstruction was established.  That's how I got to the total

20   offense level 33, criminal history category I.

21             MR. GINSBERG:  Yes, I understand that, your Honor.  We

22   still have a number of enhancements added up on top of this

23   20-point figure that, as I said, many people think is done in a

24   way that doesn't really --

25             THE COURT:  I understand.

1    MR. GINSBERG:  It's not really appropriate.

2    THE COURT:  I understand, Mr. Ginsberg.

3    MR. GINSBERG:  Now, loath as I am to make a direct

4  comparison to the Tucker case, because that was my case as

5  well, I think there are comparisons to be made.  And I think,

6  in making those comparisons, the outcome should be helpful and

7  favorable to Mr. Bergstein.  In that case, although the

8  guidelines were astronomical because of all the factors that we

9  discussed, we had an individual who over a period of more than

10  15 years was involved in the same kind of conduct that led to

11  his conviction.  There was a loss or a gain of $3 billion.  It

12  was an individual with two prior convictions for fraudulent

13  conduct, somebody who had a family, had two children who were

14  significantly older than Mr. Bergstein's children, and your

15  Honor saw fit, for all the reasons you indicated before, the

16  loss factor and all these other factors and how the

17  enhancements apply and what it led to, to make a determination

18  that the sentence in that case should be 15 years, even though

19  the guideline suggestion was 2,000 months.  I think if I

20  remember correctly, the probation department recommended 28

21  months.

22    THE COURT:  Not 28 months.  200 --

23    MR. GINSBERG:  Twenty-eight years.

24    THE COURT:  Twenty-eight years.

25    MR. GINSBERG:  I'm sorry.

I6RHBerS

1          THE COURT:  Yes.

2          MR. GINSBERG:  Twenty-eight months I would have taken.

3    That would have been more than a 90 percent reduction, I think.

4    And I'm saying you should apply directly to this case.  As your

5    Honor pointed out, the numbers there started out such a high

6    level that it needed to have a different calculus made by the

7    Court to come up with an appropriate and fair sentence.  But I

8    am suggesting that there should be a very substantial departure

9    here, below guidelines sentence here, because the mitigating

10   factors that exist here are far beyond any mitigating factors

11   that existed in that case.

12          And there was another case that your Honor had,

13   preceded I think by maybe few months or so the Tucker case,

14   which was the case of Billy Walters.  And that was a -- I know

15   that was essentially an insider trading case, but it was fraud.

16   And I believe your Honor's sentence was five years, which may

17   have been above the guideline or suggested sentence by the

18   probation department.  But that was an individual who, as I

19   think the Court was well aware, had been charged four times

20   previously in the state of Nevada, but cases were either

21   dismissed or found not guilty.  He was also charged federally

22   in the District of Nevada, and up until the time he moved to

23   Nevada had lived his life in Kentucky as an illegal bookmaker.

24   And the loss in that case, as I recall, was about $40 million.

25          So while it's not directly on point with this, there's

somebody with a background not nearly full of good deeds and

friends and community people as Mr. Bergstein has and a loss

that was twice as much and a criminal history that was

unsavory, unpleasant, even though it may have been without a

conviction. And so your Honor in that case saw fit to give a

sentence that was five years as appropriate.

And here in this case, with all the mitigating factors

that we have, we suggest balance against everything, we think

that all of those argue for a sentence below five years, as I

suggested before, three or four, but if the Court disagrees, no

more than five. That's a lot of time for somebody to be in

jail. We get used to, I think all of us who do this work, we

get used to these numbers being thrown around, whether it's 128

months or 200 months, 14 years, and possibly at some points we

become sort of immune to what that really means. Three, four,

five years in jail for somebody to be separated from their

family for their first conviction the first time in their life

with two young children is very significant, and it would not

be a slap on the wrist, and it would not do a disservice to

justice, and it would not, not have an effect -- general

deterrence effect. Because somebody looking at the sentence,

seeing somebody who went to jail after their first conviction,

56 years old, with all these good things that they had

previously done in their life is not going to say, I don't

believe, well, I'll go out and do the same thing because maybe

1  I'll only get three or four years.  I don't think that's how it

2  works.

3              And as to specific deterrence, somebody with no prior

4  record, who's now separated from his family and will be in jail

5  for a number of years, as Mr. Bergstein will be at 56 years

6  old, will be specifically deterred from any future conduct.

7  The government tries to extrapolate out of one part of our

8  submission, that is, the recidivism charts and tables, extract

9  out white-collar criminals.  They suggest that, well, the table

10  may be correct, but it really applies more to people who commit

11  violent crimes and when they get older, and it's unlikely at 55

12  years old they're going to go out and commit a street robbery

13  again.  But somebody who serves three or four years in jail and

14  comes out of jail at 60 years old is capable, certainly, of

15  committing another crime, but that doesn't mean it's going to

16  happen, and it doesn't mean that the tables and whatever -- to

17  whatever extent they're predictors, aren't applicable, because

18  they include all different kinds of crime in those tables.

19              So the chance of recidivism, I suggest, is extremely

20  low because of the way this will affect David Bergstein and his

21  family and the punishment that it will place upon him and his

22  family.

23              I have only been involved in the case for a relatively

24  short period of time.  Before I filed my notice of appearance

25  last week, I began to meet with Mr. Bergstein, and for some of

1   the reasons I maybe shouldn't have mentioned at the end of the

2   day yesterday, I was hesitant to get involved but I decided to

3   for a number of reasons, including my own personal reasons.

4   And in that relatively short period of time, maybe over two

5   months, I have seen somebody who everybody told me, all the

6   other lawyers told me and what I read about, is a really

7   hard-charging, optimistic person to a very significant degree

8   be beaten down, change his view, not be the same optimistic

9   person, be fearful, anxious about his life, but more

10  importantly, his family's life and his children's life.

11          Four months in the MCC for somebody who's never been

12  in jail before in some sense is way more than four months in

13  jail.  I know in certain instances in this court in sentencing

14  memoranda lawyers argue that serving -- being in the MCC or MDC

15  waiting for sentence or waiting for trial is far worse than

16  being in a jail after you're sentenced and that the court

17  should even consider that as a basis for departure.  I'm not

18  suggesting that here, but I'm suggesting to your Honor it is a

19  very hard place to spend time when you're at this age and never

20  been involved in criminal activity and never been convicted of

21  a crime before and your family's on the other coast and you

22  have two young children.

23          I believe I've offered everything I wanted to say.  I

24  know I spoke for a long time.  I felt compelled to do it, even

25  though we put in a substantial submission and your Honor is

1  fully aware of the facts of this case.  I would ask the Court

2  for a certain specific recommendation, either now or when your

3  Honor imposes sentence, there are certain things we would

4  request of the Court, so I don't know how your Honor wishes me

5  to do that.

6              THE COURT:  Hold it for the end.

7              MR. GINSBERG:  I will hold it for the end.

8              So if your Honor has no questions of me, I'll be happy

9  to sit down and listen to the government.

10             THE COURT:  Thank you, Mr. Ginsberg.

11             Mr. Bergstein, this is your opportunity to speak, to

12 bring to the Court's attention any facts or circumstances that

13 you believe I should take account of in passing sentence upon

14 you.  If there's anything you wish to say, this is the time to

15 say it.

16             THE DEFENDANT:  I wrote some notes down.  Is that OK

17 if I look at them?

18             THE COURT:  That's fine.

19             THE DEFENDANT:  So on advice of counsel, I'm limited

20 to what I can say, but I wanted to address the Court, to the

21 extent I can respectfully, and ask your Honor to sentence me

22 based on my whole life and not the --

23             THE COURT:  I'll tell you what.  We're going to take a

24 five-minute recess, and we'll resume in five minutes, give the

25 court reporter an opportunity to take a break.  Thank you very

1  much.

2         (Recess)

3         THE COURT:  Mr. Bergstein, you may proceed.

4         THE DEFENDANT:  So on advice of counsel, I'd like to

5  limit my remarks, but I wanted to address the Court, to the

6  extent I can, respectfully ask your Honor to sentence me based

7  on my whole life and not just on the government's case in front

8  of me.  I know it's not that relevant.  In the last decade --

9         THE COURT:  Why don't you sit down and get the

10 microphone close to you, and I'll be able to hear you better.

11        THE DEFENDANT:  Is this OK?

12        THE COURT:  That's fine.  Keep your voice up, please.

13        THE DEFENDANT:  In the last decade, I lost materially

14 most of what I built up in my life leading up to that point,

15 but it's all irrelevant.  I'm blessed.  I have a beautiful

16 family, and I have many friends from childhood until today, and

17 many of them have stood by me and I'm very grateful for.

18        My main focus is to get back to my sons who I've

19 waited my whole life to meet.  I regret anything I've done that

20 jeopardizes any minute I can't spend from them, and the

21 sentence that's suggested would take me away until their 20s.

22        And I put myself in your mercy and ask you to, as

23 quickly as you can, return me to them so I can spend time with

24 them and also with my life with my wife, who has been very

25 supportful and never wavering.  I love her very much.

1          That's all I have to say.  Thank you.

2          THE COURT:  Thank you, Mr. Bergstein.

3          This is the government's opportunity to speak.

4          MR. IMPERATORE:  Your Honor, the Section 3553(a)

5    factors weigh decidedly in favor of a significant term of

6    imprisonment, comparable to what probation recommends in the

7    presentence report.  And let me begin with the seriousness of

8    the offense.

9          Defense counsel has suggested in this case that the

10   facts of this trial that came out at trial don't really matter

11   when your Honor sentences the defendant.  Obviously, your

12   Honor, that makes no sense, and it of course is not surprising,

13   given that the facts that came out at this trial reflect

14   extraordinary misconduct and really do bear on all of the

15   3553(a) factors, as I'll address.

16         The defense has suggested that the defendant sort of

17   walked into a conspiracy that existed between Hallac and Jason

18   Galanis.  That's just wrong.  At all times it was David

19   Bergstein who was the driving force and the originator of this

20   criminal scheme.  It was Bergstein who sought out Weston and

21   its big pool of investor money because he knew he could get

22   rich by robbing them.  It was Bergstein who told lies to take

23   control of tens of millions of dollars of victim money.  And it

24   was Bergstein who spent it, who funneled it through shell

25   companies in order to get it to himself and to other people so

1   he could make himself and others rich.

2           This, of course, was not some isolated lapse in

3   judgment.  It was a concerted campaign of lies and deceit that

4   went on for years.  There's nothing aberrant, as the defense

5   has suggested, about this conduct.  I want to highlight just a

6   couple examples of it, of the extraordinary acts of fraud that

7   were proven up in this courtroom by witnesses and documents,

8   not only because they bear on the significance of the offense,

9   because of what they show about David Bergstein as a person,

10  because of how they bear on the 3553(a) factors.

11          The defense has asked your Honor to take into account

12  his purported acts of kindness toward others.  Your Honor will

13  recall the testimony of Jerry Swartz who was in his late '70s

14  when he took the witness stand.  He suffered a serious stroke.

15  He was an inventor who was debilitated by a stroke that, in

16  essence, sapped him for the rest of his life.  And what did

17  Bergstein do?  He lied to him.  He robbed him, and he used him.

18  He stole money from him in the course of an investment, he

19  strung him along for years, and then he used his name as a pawn

20  to get more money from Weston.  That's what he did to Jerry

21  Swartz.

22          Defense counsel has cited David Bergstein's ethics.

23  What did your Honor see in this courtroom?  He created an

24  arsenal of fake documents to try to defraud Weston and its

25  investors, and even created a fake balance sheet to be used in

1    an SEC filing to defraud investors across the country.  They've

2    cited his charity, but they overlook his telling dozens of lies

3    to Weston and its investor to take control of money and pocket

4    it for Bergstein's own family.  And what did Bergstein do in

5    the face of this overwhelming evidence that came in in this

6    courtroom?  Despite their claim that he respects law

7    enforcement, Bergstein obstructed justice on a massive scale to

8    try to deceive your Honor and the jury.

9         And what your Honor has seen over the last year and a

10   half is the following approach:  Bergstein has tried to place

11   blame on everybody he can think of but himself.  Even today,

12   even on his own sentencing day, his counsel spent 15 minutes

13   taking shots at the government.  Today Bergstein should be held

14   accountable for taking this tack.

15        Let me turn to the history and characteristics of the

16   defendant.  And I want to be clear, the defense totally

17   misconstrues what the government's argument is on this factor

18   and what really matters here.  The defense's argument that a

19   below guidelines sentence is appropriate largely hinges on this

20   factor, but on the facts of this case, it is not a mitigating

21   factor, it's an aggravating factor.

22        The defense emphasizes that Bergstein has the support

23   of his family and friends, that he comes from a good

24   background, that he has a good name.  All of that appears to be

25   true, your Honor, but the point is that this is a defendant who

1    has enjoyed so many benefits in his life that so many others

2    have not.  Nearly every day defendants come into this courtroom

3    having been accused of serious crimes or convicted of serious

4    crimes, and many of them have done so out of financial

5    desperation.  This defendant could not stand in more stark

6    contrast to those other defendants.  He had no financial need

7    to commit this crime.  He was a rich man who lied and stole in

8    order to get richer at the expense of other people.

9         And the evidence and the presentence report have

10   highlighted other characteristics of this defendant that the

11   defense today has overlooked: his greed, his entitlement, his

12   defiance, his contempt of the law, and his victims.  In short,

13   he's somebody who believes he doesn't need to be treated in the

14   same way that others should be treated.  He believes he's above

15   the law.  He's demonstrated that throughout the course of this

16   case.

17        For someone who's enjoyed the advantages in his

18   background, his family support, his education, committing a

19   crime of this type is worthy of substantial punishment.  And I

20   would note also, your Honor, that probation has noted the

21   absence of any mitigating factors here.

22        Let me turn next to the compelling need in this case

23   for specific and general deterrence, to promote respect for the

24   law, and protect the public from future crimes of the

25   defendant.  The notion that Mr. Bergstein has been adequately

1  deterred to date is laughable.  If ever there was a case of a

2  first-time white-collar offender where there was such a

3  substantial need for deterrence, this would be it, your Honor.

4       First of all, it's not really the case that Bergstein

5  is a first-time offender.  He is in the sense that this is his

6  first conviction, but he's a repeat offender in the sense that

7  he committed the media scheme, the film-related investment

8  fraud scheme which was the origin of the Weston fraud.  He

9  wasn't convicted of that.  He wasn't charged with it when it

10  took place, but it was proven at trial, and it was, among other

11  things, the motive for the Weston fraud.  That was an

12  independent act of fraud.  And he also committed the bids

13  offense, which was passing a fake balance sheet in order to

14  deceive investors in an SEC filing.

15       And through his words and actions in this case, your

16  Honor has seen that Bergstein is totally undeterred.  He's

17  shown a profound lack of remorse, and he's done little things

18  to try -- that show your Honor that.  Just take a couple of

19  examples.  Although your Honor has to impose forfeiture and

20  restitution, Bergstein has said essentially nothing about

21  himself, about his financial condition in the presentence

22  report.  He's tried to pocket every dollar he could paying no

23  taxes, no personal income taxes, for a decade.  And he also

24  continues to litigate against the very -- some of the very

25  victims in this case in civil actions as well as the SEC.

1      And the obstruction in this case, your Honor, was

2 extraordinary.  It wasn't just one lie.  It wasn't just a lie

3 to the SEC.  It was fabricating documents on a grand scale and

4 providing fabricated testimony for days.  And even after

5 sitting through the overwhelming evidence in this trial, the

6 defendant remains defiant.  It's apparent that this conviction

7 has had no real deterrent effect on him.

8      He has cited one recorded call that was in the

9 government's sentencing submission, while the government has

10 heard lots of other calls of this defendant in prison, and what

11 is he doing?  He's continuing to do, quote/unquote, deals.  A

12 deal involving something called Flavor or producers, and he

13 continues to solicit money.  And he continues to tell people

14 that he's going to get out of jail and his appeal will be a

15 slam dunk.

16      In short, your Honor, after presiding over a four-week

17 trial and all the other proceedings in this case, your Honor

18 has a very clear sense of who this defendant is.  And it's

19 apparent at this point that the only thing that will really get

20 through to him, the only thing that will protect the public

21 from future crimes, and the only thing that will provide some

22 measure of deterrence is a very substantial sentence of

23 imprisonment, along the lines of what probation has

24 recommended.

25      Finally, let me just address two other arguments the

1    defendant has made.  One is about RDAP.  The defendant's claim

2    that he's eligible for RDAP is based solely on his own words,

3    what he's told probation, and it stands in contrast to what he

4    told the pretrial during his presentence interview where he

5    didn't highlight any drug abuse or alcohol abuse.

6         Secondly, defense has argued that the guidelines in

7    this case, particularly the loss guideline, overstate the

8    seriousness of the offense.  That argument is commonly made, of

9    course, in fraud cases, but it's not one that carries any

10   weight here.  First of all, this is not a defendant who is

11   being sentenced as a bit player in some larger conspiracy.  He

12   was the one that told the lies to take control of all of the

13   investor money, and he was the one who decided how it would be

14   used and to spend it on himself.

15        Secondly, your Honor, there are so many aspects of the

16   criminal conduct that have come out in this trial that are not

17   even reflected in the guidelines.  Even if the defendant never

18   fabricated a single document to introduce before the jury, his

19   guidelines would be the same.  Even if he never committed the

20   media scheme or tried to defraud investors in an SEC filing,

21   his guidelines would be the same.  The conduct in this case was

22   so pervasive that the notion that somehow the guidelines

23   overstate the severity of the offense just falls flat.

24        So for all these reasons, your Honor, we submit that a

25   very substantial term of imprisonment is appropriate here.

1          THE COURT:  Thank you, Mr. Imperatore.

2          This is the Court's statement of reasons for the

3    sentence to be imposed on David Bergstein.  In sentencing

4    Mr. Bergstein, I've considered each of the submissions that I

5    outlined at the outset of this proceeding.  I've considered the

6    thoughtful statements by Mr. Ginsberg and by Mr. Imperatore and

7    the brief but sincere statement by Mr. Bergstein.

8          I've considered each of the factors under Section

9    3553(a).  I acknowledge that I need not recount all that I've

10   considered, but I have considered each of the 3553(a) factors.

11   I will comment on some of them.

12         With regard to the nature and circumstances of the

13   crime, the defendant was charged in the seven-count indictment.

14   After four weeks of trial, a jury of 12 citizens deliberated

15   and reached a prompt verdict of guilt on all seven counts, and

16   I have denied the post verdict motions in this case as not

17   meritorious.

18         David Bergstein was not a bit player in this

19   conspiracy.  He successfully guided his coconspirators and at

20   times deceived his coconspirators.  It was a crime and a series

21   of crimes that took a lot of time to think about, to plan, to

22   execute on.  It was not a spur-of-the-moment circumstance.  It

23   required great intelligence and great ability to commit the

24   crimes.  And notably, Bergstein, Hallac, and Wellner agreed

25   that money that belonged to the P2 Fund that had been

contributed by investors to be part of a fund of funds would,

contrary to the stated purpose of the investments and in

violation of Hallac and Wellner's duties as fiduciaries, would

be loaned to Arius Libra.  And this money was diverted to uses

for the personal benefit of Bergstein and his family.

For example, August 16, 2011, Bergstein sent an email

to Hallac and Wellner, attaching a borrowing certificate on the

P2 loan and requesting additional money.  He represented that

the money was "in order for us to be able to meet the dates we

are looking at, completed PowerPoint presentations, definitive

docs within two weeks, we need the resources in place now."  In

truth, the money was being disbursed, in part, to his family

trust account, to pay his health insurance, to pay Kia Jam

personally.

In the August 29, 2011, borrowing certificate, he

represented that the funds would be used for the benefit of

Arius Libra and acquisitions involving companies known as

Bidz/Matrix.  In truth and in fact, Bergstein misappropriated

much of the funds and used them to pay his wife's credit card

bills and his own personal legal bills and further diverted the

funds to an entity used by Kia Jam to pay for personal

expenses, and the like.

Same thing with the October 19 borrowing certificate.

The proceeds will be used for Pineboard.  In fact, Bergstein

diverted a million dollars, in substantial part to pay for his

1    wife's and Kia Jam's credit card bills, the Hydro Spa Center,

2    Jason Galanis' personal legal bills, and unrelated business

3    expenses.  The fact of the matter, though, is that the P2 loan

4    was in breach of Hallac and Wellner's fiduciary duties, and

5    Bergstein knew this.

6            In December 2011, in a presentation to a Wimbledon

7    Fund investor, he touted the benefits of the Gerova unwind and

8    generated a presentation which represented that a company

9    called Owari Opus, an entity purportedly controlled by

10   Bergstein, had arranged the loan to Arius Libra, when in truth

11   and in fact the loan was made by the P2 Fund.

12           It was argued:  Well, I didn't say Owari Opus made the

13   loan, I said they arranged the loan.  It was a deliberately

14   deceptive message designed to hide the fact that the source of

15   the money was the P2 Fund and that it was secured by assets of

16   the Wimbledon Fund.

17           And then, of course, there was the TT Portfolio.

18   Those funds were to be invested only in Tewksbury.  And as I

19   heard at the trial, the investment in Tewksbury was at that

20   point closed.  So having a position in Tewksbury was something

21   considered by investors to be something of value, and one could

22   indirectly invest in Tewksbury by participating in the TT Fund.

23   And, again, in order to make the loan from the TT portfolio to

24   Swartz IP work, Bergstein caused a fake balance sheet to be

25   presented and created that represented that Swartz IP had

approximately 19 million in assets, when it had nothing of the

sort.

I have to say that the Court is mindful of the use of

TT proceeds to pay off American Express bills, to purchase

bonsai trees, antique firearms, dental work, and the like.  And

of course, quite notably was the obstruction of justice in this

case.

All defendants are not only presumed to be innocent,

but they have an important constitutional right to put the

government to its burden at a trial.  And the government has an

incredibly high burden in a criminal case, proof beyond a

reasonable doubt to the satisfaction of 12 jurors.  But when a

person comes into the courtroom and deliberately lies on the

stand, they are corrupting the process, obstructing the

process, and here it was more than that.  It was also what I

have found to be the payment for fabricated documents from

another person.

This was induced and then presented to lawyers who, I

am sure, were innocent of the fabrication and presented to them

knowing that they would turn them over to the government, and

if the government had not picked up on certain characteristics

of the document, the exposure of the fraudulent creation may

never have come to light.  That's how it came to light.

Documents might have come into evidence.  In fact, I ruled they

could come into evidence.  And wisely, defense counsel did not

1  offer them, but the obstruction of justice was nevertheless

2  complete.

3       So this is really interrelated crimes over a

4  substantial period of time for personal financial gain by a

5  person who was born with and developed through their own

6  talents great gifts, gifts that enabled them to support their

7  family well.  Speaking of the history and characteristics of

8  the defendant, I've read about his father who was a Holocaust

9  survivor and who also lived under difficult circumstances in

10  Uzbekistan and came to the United States.  He couldn't get into

11  the United States immediately because he was disabled.  He had

12  lost his arm, and he was a tough father and someone who put a

13  great premium on education.

14       I only wish that Mr. Bergstein and Mr. Bergstein's

15  family could have been here earlier this week when I sentenced

16  James Green.  Mr. Green is not that different in age from

17  Mr. Bergstein.  He's 50; he's not 55.  But Mr. Green as I

18  remember it, never knew who his father was.  His mother had

19  addiction problems.  Between ages seven and ten, he was three

20  times taken away from his mother, who was introduced to drugs

21  by his uncle at age nine and had a daily habit by age 15 and,

22  no surprise, became a person with extensive criminal history

23  and a crack addiction.  That was this week.

24       That too is a difficult life.  I don't underestimate

25  it was tough growing up in Brooklyn before the move to Teaneck.

However, Mr. Bergstein, was able to graduate from college at a young age, was able to pursue graduate studies as long as he wanted, and did so for at least two years, and was successful as an entrepreneur.  He didn't have to wind up in the position he is in today.  His back was not up against the wall.  His conduct was not the product of addiction, and it was not the product of shortcomings in his upbringing.

He ripped off the hedge fund investors.  It was a scheme that held promise of success because the two insiders who were managing the money of the hedge fund investors were insiders on the scheme.  Mr. Bergstein persuaded himself and in his own mind that Hallac and Wellner's responsibilities to their investors were their problem.  No matter how clear it was to him that what was going on was in breach of those duties, he apparently satisfied himself that that was not his concern, even though he knew or should have known from the facts that it was very much his concern.  He was acting with knowledge of the responsibilities they held.

Mr. Bergstein has done good things in his life.  He's been, by all accounts, a good father and a good spouse.  He has done good deeds for other people along the way, and some of them are quiet good deeds that were not designed to be paraded in the public square.  There's nothing wrong with somebody making flashy charitable contributions, but the fact of the matter is that that is sometimes for the quid pro quo of the

adulation or admiration that goes along with it.  The quiet

good deeds are more important, from my standpoint, in getting a

sense of who a person is.  And I agree with Mr. Ginsberg that

the sentencing process is a holistic matter.

I've considered the need for just punishment in this

case.  Mr. Bergstein's conduct should be punished severely.

I've considered the need to protect the public from further

crimes of this defendant.  Because of the felony conviction, I

think it would be much more difficult for him to reoffend.  So

that, I do not rank very highly in my consideration.

I certainly think there's a need to deter others from

conduct of this sort.  This sort of conduct is extremely

difficult to detect, uncover, and to prosecute successfully.

It takes enormous resources to prosecute, and there should be a

message to others who would engage in this conduct that you

will pay a steep price.

I've considered the impact on the family, and in my

experience, it is one of the ugliest aspects of criminal

activity and the sentencing that results that there are people

who did nothing wrong who are innocents who suffer as a result.

And I wholly understand, not in the sense of living somebody

else's life but in hearing somebody else's life, how important

Mr. Bergstein's concerns are about his children.  I understand

that, but that is a function of sentencing.  There are many

cases and others who stand before this Court who have equally

1  compelling stories about the impact on their families.  And

2  it's tough, whether you're someone who's had privileges in life

3  or no privileges in life, whether you've been advantaged or

4  disadvantaged.  If you love your children, being separated from

5  them may be the hardest part of punishment.  I get that.  And

6  the impact on the children, I get that as well.  But that does

7  not amount to a get-out-of-jail card for anybody who crosses

8  the threshold of this or other courtrooms.

9         I've considered the need to avoid unwarranted sentence

10  disparities among persons convicted of similar crimes.  It's

11  inappropriate to impose an overly harsh or overly lenient

12  crimes, because that's not rule of law.  That's a form of

13  seduction by advocacy.  It's important that sentences be

14  transparent and they be just across the board for persons who

15  engage in all types of criminal behavior.

16         I've considered the sentencing guidelines, policy

17  statements, and official commentary of the United States

18  Sentencing Commission.  I've considered them in an advisory

19  manner and recognize that I am not obligated to sentence within

20  the guidelines.  Based on all of the foregoing, I conclude that

21  a sentence of 96 months' imprisonment, three years' supervised

22  release, a fine of $250,000, restitution and forfeiture to be

23  determined, and a special assessment of $700 is sufficient, but

24  not greater than necessary, to achieve the purposes of Section

25  3553(a).

1      I will say, for the record, that I have considered

2   also what I might do in this case were the guideline range

3   different than it is, and I can say, having thought about this,

4   that if this case were anywhere in Zone D between offense level

5   28 and offense level -- I'm sorry, offense level 28 and offense

6   level 37, I would likely give and I would give the same

7   sentence that I've given here.  So because I've considered

8   factors under 3553(a) which are above and beyond the

9   considerations of the guidelines, here, I've found a total

10   offense level 33, criminal history category I, and I've

11   sentenced below the advisory guidelines for the reasons which I

12   have laid out.  And, again, as I've said, the foregoing is

13   sufficient, but not greater than necessary, to achieve the

14   purposes of Section 3553(a).

15      Does the defendant or his counsel have any objection

16   to the Court's proposed sentence or the statement of reasons

17   for that sentence?

18      MR. GINSBERG:  We have no objection other than the

19   fact that, obviously, based on what we said, we disagree and

20   respectfully believe a more lenient sentence was appropriate,

21   but nothing else.

22      THE COURT:  All right.  Thank you.

23      Same question for the government.

24      MR. IMPERATORE:  No, your Honor.

25      THE COURT:  All right.

1    MR. IMPERATORE:  We would just like to clarify that

2  the sentence imposed by the Court is concurrent on all counts,

3  with the first count with the statutory maximum of 16 months?

4    THE COURT:  I'm going to pronounce sentence in a

5  moment, and I'd be delighted to hear anything you have to say

6  when I conclude.

7    So, Mr. Bergstein, if you'll please stand, I will

8  pronounce sentence.

9    David Bergstein, it is the judgment of this Court that

10  you are hereby remanded to the custody of the United States

11  Bureau of Prisons to be imprisoned for 96 months as follows:

12  Sixty months on Counts One through Three and 96 months on each

13  of Counts Four, Five, Six, and Seven, all counts to run

14  concurrently.

15    Following release from imprisonment, you shall be

16  placed on supervised release for a period of three years

17  concurrent on each count with the following terms and

18  conditions:  You shall not commit another federal, state, or

19  local crime.  You must not unlawfully possess a controlled

20  substance.  You must refrain from any unlawful use of a

21  controlled substance and submit to one drug test within 15 days

22  of release from imprisonment and at least two periodic drug

23  tests thereafter as determined by probation.  You must

24  cooperate in the collection of DNA as directed by probation.

25    The standard conditions of supervision 1 through 13

1    are imposed with the following special conditions:  You must

2    provide the probation officer with access to any requested

3    financial information while any of the financial penalties,

4    including restitution and forfeiture, are outstanding.  You

5    must not incur new credit card charges or open additional lines

6    of credit without the approval of the probation officer unless

7    you are in compliance with the installment payment schedule.

8           You must submit your person, residence, place of

9    business, vehicle, or any property or electronic devices under

10   your control to a search on the basis that the probation

11   officer has reasonable suspicion that contraband or evidence of

12   a violation of the conditions of release may be found.  The

13   search must be conducted at a reasonable time and in a

14   reasonable manner.  Failure to submit to a search may be

15   grounds for revocation.  You must inform any other residents

16   that the premise may be subject to search pursuant to this

17   condition.

18          You will participate in an outpatient treatment

19   program approved by probation, which program may include

20   testing to determine whether you have reverted to using drugs

21   or alcohol.  You must contribute to the cost of services

22   rendered based on your ability to pay and the availability of

23   third-party payments.  The Court authorizes the release of the

24   available drug treatment evaluations and reports, including the

25   PSR, to the substance abuse treatment provider.

I6RHBerS

1    It is further ordered that you must pay to the United

2    States a special assessment of $100 -- I'm sorry.  Of $700,

3    which shall be due immediately.  The Court imposes a fine of

4    $250,000, which shall be payable 90 days after the entry of

5    judgment in this case.  The Court imposes forfeiture of all

6    moneys received as proceeds of the crime or used as

7    instrumentalities of the crime or traceable to same.  The

8    amount of which will be determined in an order to be entered

9    within 90 days.  The Court also will impose restitution in this

10   case in an amount to be determined with regard -- after

11   receiving further submissions.

12   I should state for the record that part of the

13   government's sentencing submission were victim impact

14   statements which I have considered in connection with the

15   sentencing in this case.

16   Government agree the sentence imposed is lawful?

17   MR. IMPERATORE:  Yes, your Honor.

18   THE COURT:  Same question, Mr. Ginsberg?

19   MR. GINSBERG:  Yes, your Honor.

20   THE COURT:  OK.  Sentence is so imposed.

21   Mr. Bergstein, you have the right to appeal the

22   sentence I have imposed.  If you cannot afford the cost of an

23   appeal, you may apply for leave to appeal as a poor person.

24   The time limits for filing a notice of appeal are brief, and if

25   you request, the clerk of court will prepare and file a notice

1    of appeal on your behalf.

2              Do you understand all of that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  All right.  Please be seated.

5              With regard to drug treatment, I will recommend that

6    the Bureau of Prisons evaluate Mr. Bergstein for appropriate

7    drug treatment.

8              And your recommendation on housing?

9              MR. GINSBERG:  Your Honor, assuming that the Bureau of

10   Prisons calculates Mr. Bergstein's category such that he can

11   serve his time in a camp, we would ask your Honor to recommend

12   the satellite camp at CI Taft, T-a-f-t.

13             THE COURT:  Where is that located?

14             MR. GINSBERG:  California.

15             MR. BIENERT:  It's near Bakersfield, California.  It's

16   in Southern California.

17             THE COURT:  OK.  I will recommend Mr. Bergstein be

18   placed in a facility as close as feasible to his family to

19   facilitate family visits and, if deemed appropriate, CI Taft.

20             MR. GINSBERG:  Thank you, your Honor.

21             I have one more matter.  Your Honor, at the conclusion

22   of the trial, after conviction, your Honor remanded

23   Mr. Bergstein.  There will be an appeal filed in this case, and

24   without repeating all the arguments that were made to your

25   Honor at the time you remanded him, I would just renew the

1    application.  I understand the standard, but I would renew the

2    application for his release on bail pending appeal.  If it's OK

3    with your Honor, I'll just rely upon the arguments that were

4    made at the time, which your Honor is familiar with.

5         THE COURT:  Yes.  Thank you, Mr. Ginsberg.  That

6    application is denied for substantially the reasons laid out on

7    the record today and also the Court's belief that the prospects

8    of appeal in this case or success on appeal are low.

9         Is there anything further from the government?

10        MR. IMPERATORE:  No, your Honor.

11        THE COURT:  Anything further from the defendant?

12        MR. GINSBERG:  Yes, yes.  I'm reminded that there are

13   going to be further proceedings regarding restitution and

14   forfeiture and --

15        THE COURT:  Well, they're on paper, Mr. Ginsberg.  You

16   will recall that I made a very --

17        MR. GINSBERG:  Yes.

18        THE COURT:  -- very precise inquiry of each side, and

19   I determined yesterday that the fact record on restitution and

20   forfeiture is now closed.  So this will be done on a paper

21   record, and I believe I set a briefing schedule.

22        MR. GINSBERG:  You did.  I was just going to say, in

23   the event that for some reason Mr. Bergstein's presence would

24   otherwise be required, he wishes to waive his presence so that

25   it's clear on the record now, and we don't have a problem later

1    on.

2         THE COURT:  All right.  Mr. Bergstein, is that correct

3    that you -- you have a right to be present if there are further

4    proceedings or argument on the issue of restitution and

5    forfeiture.  Do you understand that?

6         THE DEFENDANT:  Yes.

7         THE COURT:  And what is your desire in terms of being

8    present for that?

9         THE DEFENDANT:  To waive it.

10        THE COURT:  All right.  I find that the waiver is

11   knowing and intelligent, and it is accepted.

12        Thank you all very much.

13        MR. BIENERT:  I don't know that this has to be said on

14   the record, but I want to say it.

15        THE COURT:  Go ahead.

16        MR. BIENERT:  The reason that he wants to -- one

17   reason why he's waiving is he would request that his -- that

18   Bureau of Prisons is able to go forward on the designation

19   process right away.  I just want that clear on the record so

20   that they understand they don't have to keep him here until

21   there's a final closure after the restitution.

22        THE COURT:  I understand that, and we will get the

23   judgment done tomorrow, which I hope will expedite that.  Just

24   be seated a moment.

25        Mr. Bergstein, you have a job to do, and that is to

1    figure out how you are going to stay in touch with the family

2    members who have supported you in your time of need and how you

3    are going to stay in touch with your children and deliver a

4    positive message to them about the importance of a law-abiding

5    life.  And I wish you and your family long and healthy lives.

6              We're adjourned.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25